UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| ANTHONY VINEYARDS, | Case No. 1:20-cv-00506-JLT-CDB |
|---|---|
| Plaintiff, | |
| v. | ORDER DENYING PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE AND DENYING DEFENDANT'S MOTION TO DISMISS |
| UPL NA INC., ARYSTA LIFESCIENCE NORTH AMERICA, LLC, BRANDT CONSOLIDATED INC., NUTRIEN AG SOLUTIONS, INC., | |
| | (Docs. 47, 58) |
| Defendants. | |

Anthony Vineyards is a California corporation that grows organic grapes in Kern County. (Doc. 1 at ¶ 9; FAC, Doc. 29 at ¶¶ 1, 11.) It has filed its First Amended Complaint ("FAC") against Defendants Arysta Lifescience North America, LLC, UPL NA, Inc., Brandt Consolidated, Inc., and Nutrien Ag Solutions, Inc. ("Nutrien") for selling and distributing a miticide, which resulted in the destruction of its grape crops. (Doc. 29 at ¶¶ 2–7.)[1] Pending is Plaintiff's Request for Judicial Notice ("RJN"), (Doc. 58), and Nutrien's Motion to Dismiss, brought pursuant to Rule 12(b)(6). (Doc. 47.) For the reasons stated below, Plaintiff's RJN is **DENIED** and Defendant's Motion to Dismiss (Doc. 47) is also **DENIED**.

---

[1] Plaintiff has voluntarily dismissed Defendants Natural Plant Protection and Jenco Enterprises, Inc. pursuant to Rule 41(a). (Docs. 30, 55.)

1

## I.     BACKGROUND

Biomite is a "minimum risk biochemical miticide that controls mites." (FAC, Doc. 29 at ¶ 2.) According to its label, the user is to add Biomite to an empty spray tank, mix in water "to half the required amount," and then agitate the mixture thoroughly and fill the tank with the remaining water. (Ex. A, Doc. 85 at 2.)[2] For use on grapes, the user must add a range of 0.37–0.59 gallons of Biomite, mixed with 100–400 gallons of water, to be sprayed per acre of crops. (*Id.*) At the conclusion of the Biomite label, it states the following "WARRANTY STATEMENT":

> This material conforms to the description on the label and is reasonably fit for the purposes referred to in the directions for use. Timing, unfavorable temperatures, water conditions, presence of other materials, method of application, weather, watering practices, nature of soil, disease problems, condition of the crop, incompatibility with other chemicals, pre-existing conditions and other conditions influencing the use of this product are beyond the control of the seller. Buyer assumes all risks associated with the use, storage and handling of this material not in strict accordance with the directions given herein. NO OTHER EXPRESS OR IMPLIED WARRANTY OF FITNESS OR MERCHANTABILITY IS MADE.

(*Id.* (capitalizations in original).)

On May 18, 2019, Plaintiff "treated 40 acres of Timpson grapes and 60 acres of Scarlet Royal grapes" with Biomite, allegedly following the package's "instructions and following the advice of its pest control advisor[.]" (Doc. 29 at ¶ 12.) Specifically, Plaintiff sprayed "75.52 ounces in 300 gallons of water per acre." (*Id.*) Overnight, approximately 0.55 inches of rain fell over the treated sites, (*id.* at ¶ 13), resulting in severe fruit scarring and ultimately, the loss of all of Plaintiff's grapes, valued at $723,460.00 and $1,211,798.00, respectively. (*Id.* at ¶¶ 16–18.) Plaintiff alleges the Biomite label "is silent as to application in proximity to rain events," and

---

[2] It is clear that Plaintiff originally intended to attach "Exhibit A"—a copy of the Biomite label—to its FAC. (*See* FAC, Doc. 29 at ¶ 14 ("The Biomite label (exhibit A) allows . . ."); *see also* Doc. 84.) Indeed, Defendant argued its motion as though Exhibit A were originally attached to the FAC. (*See* Doc. 48 at 4 ("Plaintiff attached a copy of the Biomite product label as 'Exhibit A' to its FAC.").) For whatever reason, Exhibit A did not attach to the FAC, and Plaintiff instead filed the exhibit in a separate docket entry. (Doc. 85.) The Court will not fault Plaintiff for this docketing error, especially because both parties briefed the pending motion as though it were originally attached to the FAC. As such, the Court will entertain this piece of extrinsic evidence. *See Beverly Oaks Physicians Surgical Ctr., LLC v. Blue Cross & Blue Shield of Ill.*, 983 F.3d 435, 439 (9th Cir. 2020) (when resolving a motion to dismiss, the Court may review "materials that are submitted with and attached to the complaint") (internal quotation marks and citation omitted).

2

1 "fails to inform users that if Biomite is applied at less than the maximum advised water rates in proximity to a rain event, scarring can occur[.]" (*Id.* at ¶ 14.)

Plaintiff filed its FAC against Defendants, alleging they are liable for the destruction of its crops. (*See generally id.*) Nutrien filed its pending Motion to Dismiss, (Doc. 47), which the parties fully briefed thereafter. (Opp'n, Doc. 57; Reply, Doc. 59.) Also pending is Plaintiff's Request for Judicial Notice. (Doc. 58.) The Court now turns to the merits of each filing.

## II.  LEGAL STANDARD

### A.  Rule 12(b)(6)

Pursuant to Rule 12(b)(6), a defendant may move to dismiss a claim in the plaintiff's complaint if the allegation "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"At the pleading stage, all allegations of material fact are taken as true and construed in the light most favorable to the non-moving party." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. As such, the plausibility standard is a "context-specific task that requires the reviewing court to [1] draw on its judicial experience and common sense," *Iqbal*, 556 U.S. at 679, and [2] to "'draw all reasonable inferences in favor of the nonmoving party.'" *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014)). "Ultimately, dismissal is proper under Rule 12(b)(6) if it appears beyond doubt that the non-movant can prove no set of facts to support its claims." *Id.* at 773–74 (internal citation and quotation marks omitted) (cleaned up).

Finally, though resolution of a motion to dismiss under Rule 12(b)(6) is normally confined to the allegations stated in the complaint, the court "may also 'consider [1] materials that are

3

submitted with and attached to the complaint'; [2] judicial notice of matters of public record'; and [3] unattached evidence on which the complaint necessarily relies if: [a] the complaint refers to the document; [b] the document is central to the plaintiff's claim; and [c] no party questions the authenticity of the document.'" *Beverly Oaks Physicians Surgical Ctr., LLC v. Blue Cross & Blue Shield of Ill.*, 983 F.3d 435, 439 (9th Cir. 2020) (quoting *United States v. Corinthian Colls.*, 655 F.3d 984, 998–99 (9th Cir. 2011)).

### III. DISCUSSION

A.  Plaintiff's Request for Judicial Notice (Doc. 58)

Plaintiff requests the Court take judicial notice of Nutrien's "Customer Order/Delivery Ticket," which shows Jenco Enterprises shipped Biomite to Anthony Vineyards. (Doc. 58 at 3.) Though seemingly unopposed, (Doc. 48 at 2 n.2), the Court declines to judicially notice this exhibit.

"A court may take judicial notice of facts that are 'not subject to reasonable dispute' because they are either 'generally known within the trial court's territorial jurisdiction' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Polanco v. Diaz*, 76 F.4th 918, 932 (9th Cir. 2023) (quoting Fed. R. Evid. 201(b)). "[A] party requesting judicial notice bears the burden of persuading the trial judge that the fact is a proper matter for judicial notice." *Newman v. San Joaquin Delta Cmty. Coll. Dist.*, 272 F.R.D. 505, 516 (E.D. Cal. 2011) (citation omitted). Where a party requests judicial notice and supplies the Court "with the necessary information," the Court "must take judicial notice" of that fact. Fed. R. Evid. 201(c)(2).

Plaintiff provides reasons why the Court should take judicial notice of this invoice, and has failed to demonstrate that its Biomite invoice fits within the purview of either Rule 201(b)(1) or (b)(2). (*See* Doc. 58 at 1–3.) Plaintiff has failed to satisfy its burden of apprising the Court with the information necessary for the exercise of judicial notice.[3] Fed. R. Evid. 201(c)(2);

---

[3] If anything, it appears that Plaintiff argues *against* consideration of extrinsic documents outside the pleadings in its Opposition brief. (*See* Opp'n, Doc. 57 at 7 (seemingly urging the Court to abstain from entertaining extrinsic materials, or alternatively, suggesting the Court should convert the motion to dismiss into a motion for summary judgment).)

4

1   *Newman*, 272 F.R.D. at 516; *see also Engel v. United States*, No. 2:22-cv-01040-WQH-EJY,
2   2023 WL 8018331, at *7 n.6 (D. Nev. Nov. 20, 2023) (awaiting publication) ("However, Plaintiff
3   does not specify the documents for which he requests judicial notice, *nor does he state the*
4   *grounds upon which his requests are based*.") (emphasis added) (citing Fed. R. Evid. 201(c)(2));
5   *Advanced Risk Managers, LLC v. Equinox Mgmt. Grp., Inc.*, No. 19-cv-03532-DMR, 2019 WL
6   6716292, at *4 (N.D. Cal. Dec. 10, 2019) (limiting extrinsic review of an invoice because
7   "Equinox does not identify the specific facts contained in the documents that it asks the court to
8   judicially notice *and does not explain how such facts satisfy the requirements of Rule 201*.")
9   (emphasis added).  For this reason, the Court **DENIES** Plaintiff's Request for Judicial Notice.
10  (Doc. 58.)

11      B.      Merits of Motion to Dismiss (Docs. 47, 48)

12  Plaintiff brings two causes of action against Defendants for strict products liability[4], under
13  a failure to warn theory, and a separate negligent failure to warn claim.  (FAC, Doc. 29 at 3–5.)
14  Nutrien moves to dismiss both claims against it for four principal reasons.  (Doc. 48 at 6–11.)
15  The Court addresses each argument in turn.

16  "California law recognizes separate failure to warn claims under both strict liability and
17  negligence theories," *Webb v. Special Elec. Co.*, 63 Cal. 4th 167, 180 (Cal. 2016) (footnote
18  omitted), and the two claims "differ[] markedly" from each other. *Carlin v. Superior Ct.*, 13 Cal.
19  4th 1104, 1112 (Cal. 1996) (internal quotation marks and citation omitted). "In general, a product
20  seller will be *strictly liable* for failure to warn if a warning was feasible and the absence of a
21  warning caused the plaintiff's injury." *Webb*, 63 Cal. 4th at 180 (emphasis in original); *see also*
22  *Himes v. Somatics, LLC*, 16 Cal. 5th 209 (pagination and pincite pending), 322 Cal. Rptr. 3d 1, 9
23  (Cal. 2024) ("To succeed on a strict liability failure-to-warn claim, the plaintiff need only prove
24  that the manufacturer did not adequately warn of a particular risk that was known or knowable in
25  light of the generally recognized and prevailing best scientific and medical knowledge available

---

[4] Though not explicitly pleaded in the FAC, both parties construe Plaintiff's generalized "products liability" claim as falling under a theory of strict products liability.  (*See* Doc. 29 at 3; Doc. 48 at 6; Doc. 57 at 8.)  The Court agrees with the parties, particularly because the FAC asserts that Defendants are "subject to strict liability," without bringing such a separate tort claim. (Doc. 29 at ¶ 10.)

at the time of manufacture and distribution.") (internal quotation marks and citation omitted); *Carlin*, 13 Cal. 4th at 1112 (same). "Conversely, to prevail on a claim for *negligent* failure to warn, the plaintiff must prove that the seller's conduct fell below the standard of care." *Webb*, 63 Cal. 4th at 181 (emphasis in original) (citation omitted); *Carlin*, 13 Cal. 4th at 1112. "If a prudent seller would have acted reasonably in not giving a warning, the seller will not have been negligent." *Webb*, 63 Cal. 4th at 181 (citation omitted).

          *i.*      *Proximate Cause*

Nutrien contends that the complaint failed to adequately allege that Nutrien proximately caused Plaintiff's damages. (Doc. 48 at 3, 6–7.) Nutrien asserts that Plaintiff "failed to allege any facts to show that Nutrien had any role whatsoever in the distribution chain with respect to the particular batch of Biomite that allegedly caused it harm." (*Id.* at 7.) Instead, Nutrien argues that Plaintiff purportedly admits that it failed to comply with the instructions given on Biomite's product label, and that its own improper use of Biomite served as an intervening and superseding cause of its own damages. (*Id.* at 7.)

"Whether asserting a negligent or a strict liability failure-to-warn claim, the plaintiff must [ ] establish that the manufacturer's [or distributor's] failure to warn was a substantial factor in causing the plaintiff's injury." *Himes*, 322 Cal. Rptr. 3d at 9 (cleaned up) (internal quotation marks, brackets, and citations omitted); *Camacho v. JLG Indus. Inc.*, 93 Cal. App. 5th 809, 817 (Cal. Ct. App. 2023) ("A plaintiff has the initial burden to prove a defendant's product design proximately caused the injury," which "requires a showing that the alleged wrong was a substantial factor in producing the injury.") (internal quotation marks and citation omitted). It is well-established that "[s]trict liability can be asserted not only against the manufacturer of defective products, but also against distributors or sellers of defective products." *Williams v. J-M Manuf. Co.*, 102 Cal. App. 5th 250, 259 (Cal. Ct. App. 2024) (citing *O'Neil v. Crane Co.*, 53 Cal. 4th 335, 342 (Cal. 2012)). Indeed, strict products liability "applies to every entity involved in the vertical distribution of consumer goods," so long as the entity is "an integral part of the overall producing and marketing enterprise for a consumer product[.]" *Bolger v. Amazon.com, LLC*, 53 Cal. App. 5th 431, 456 (Cal. Ct. App. 2020) (internal quotation marks and citations omitted); *see*

*also id.* at 438 (determining that the popular online shopping website, Amazon.com, could be held strictly liable for the sale of a defective product because "Amazon is a direct link in the chain of distribution, acting as a powerful intermediary between the third-party seller and the consumer").

Plaintiff has plausibly alleged that Nutrien served as a direct link in the vertical distribution chain of Biomite. Plaintiff alleged that Nutrien was a distributor of Biomite, which "sold Biomite to defendant Jenco Enterprises, Inc., which sold Biomite to Plaintiff Anthony Vineyards." (Doc. 29 ¶ 7) When read in a light most favorable to Plaintiff, *In re Facebook*, 956 F.3d at 601, Plaintiff's FAC identifies Nutrien as the distributor of the particular batch of Biomite that caused it harm. (*See* FAC, Doc. 29 at ¶ 16 ("Anthony Vineyards was harmed by *the Biomite* manufactured by Natural Plant Protection and distributed by . . . Nutrien Ag Solutions, Inc.") (emphasis added).) Such pleading demonstrates Nutrien's role in the vertical chain of distribution. *Williams*, 102 Cal. App. 5th at 259; *Bolger*, 53 Cal. App. 5th at 456.

Though Defendant's second point raises issues of duty and causation, the actual crux of this argument is that by purportedly failing to comply with Biomite's instruction label, Plaintiff was contributorily or comparatively at fault. (Doc. 48 at 7 ("Plaintiff thus violated the Biomite application instructions despite an affirmative legal duty to comply. This failure constitutes an intervening and superseding cause of Plaintiff's damages that negates any liability attributable to Nutrien.")). In the seminal decision, *Daly v. General Motors Corporation*, the California Supreme Court explicitly adopted comparative fault principles in strict products liability actions. 20 Cal. 3d 725, 742 (Cal. 1978) ("[W]e conclude that a system of comparative fault should be and it is hereby extended to actions founded on strict products liability."). In doing so, the Supreme Court reflected that "strict liability has never been, and is not now, absolute liability. . . Thus[,] the manufacturer is not deemed responsible when injury results from an unforeseeable use of its product." *Id.* at 733.

On the other hand, "Defendant's liability for injuries caused by a defective product remains strict. The principle of protecting the defenseless is likewise preserved, for plaintiff's recovery will be reduced only to the extent that his own lack of reasonable care contributed to his

1  injury. The cost of compensating the victim of a defective product . . . remains on defendant[.]"
2  *Id.* at 737; *see also id.* at 742 ("[T]he term 'equitable apportionment of loss' is more accurately
3  descriptive of the process[.]"). In other words, the Court does not outright dismiss a plaintiff's
4  strict products liability where the plaintiff shares some portion of fault for its injuries, but instead,
5  the trier of fact determines the "share of plaintiff's damages which flows from his own fault[.]"
6  *Id.* at 737 ("[T]he manufacturer cannot avoid its continuing liability for a defective product even
7  when the plaintiff's own conduct has contributed to his injury."); *see also Aetna Cas. and Sur.*
8  *Co. v. Jeppesen & Co.*, 642 F.2d 339, 343 (9th Cir. 1981) ("Under this system, a defendant
9  remains strictly liable for injuries caused by a defective product, but plaintiff's recovery is
10 reduced to the extent that its lack of reasonable care contributed to the injury.") (citing *Daly*, 20
11 Cal. 3d at 736–37.); *Mariscal v. Graco, Inc.*, 52 F. Supp. 3d 973, 987 (N.D. Cal. 2014) (denying
12 motion to dismiss where defendant "argue[d] that Plaintiff's failure to wear protective eye
13 equipment constitutes product misuse, which may act as a 'superseding cause' of injury, . . . or
14 that this failure establishes Plaintiff's comparative fault so as to offset damages for design
15 defect," and that instead, "Defendant may attempt to present those theories to the jury.") (internal
16 citations omitted).

17     Nutrien argues that Plaintiff applied Biomite to its grape crops in an unforeseeable way by
18 combining "approximately 25.17 fluid ounces of Biomite per 100 gallons of water" when "the
19 Biomite product label instructs that mixtures applied to grape crops should consist of, ***at a***
20 ***minimum***, 1 quart or 32 ounces of Biomite per 100 gallons of water." (Doc. 48 at 7 (boldface
21 and italics in original).) The Biomite label clearly speaks in *gallons*, providing that "0.37
22 gal[lons]–0.59 gal[lons]" of Biomite is to be combined with 100–400 gallons of water per acre.
23 (Doc. 85 at 2.) The crux of the issue therefore lies in Plaintiff's represented unit of measurement
24 set forth in its FAC: Plaintiff alleges that it combined "75.52 *ounces* in 300 gallons of water per
25 acre." (Doc. 29 at ¶ 12 (emphasis added).) Defendant apparently presumes that this reference to
26 "ounces" indicates the *weight* of Biomite used, rather than its *volume*,[5] and thus, in its motion,

---

[5] One gram is "the metric measurement of *weight*," while 1 fluid ounce is the "American/British measurement of liquid volume." *Spacone v. Sanford, LP*, No. CV 17-02419-BRO (MRWx), 2017 WL 6888497, at *3 (C.D. Cal. May 11, 2017).

8

1  first converted the measurement of ounces to fluid ounces. (Doc. 48 at 7 (converting 75.52

2  ounces to 25.17 fluid ounces).)[6]

3        This type of argument is similar to what the Defendant argued in *Spacone v. Sanford, LP*,

4  No. CV 17-02419-BRO (MRWx), 2017 WL 6888497 (C.D. Cal. May 11, 2017). There, Plaintiff

5  brought a class action lawsuit alleging that Defendant misleadingly packaged and sold "Krazy

6  Glue® brand all-purpose adhesive" because the "capacity of the opaque outer container (the Stay

7  Fresh Container) is 0.37 ounces, while per the packaging, the inner tube contains only 0.07

8  ounces of glue." *Id.* at *1. Plaintiff therefore alleged that the consumer received "less than 20%

9  of the capacity of the container in which it is housed," and brought three causes of action under

10 the California CLRA, False Advertising Law, and UCL. *Id.* at *1–*2 (citing complaint).

11 Defendant moved to dismiss the complaint, arguing, *inter alia*, that "Plaintiff's allegation that the

12 Krazy Glue tube's capacity is 0.37 ounces refers to 0.37 *fluid* ounces," even though "Plaintiff

13 never uses the term 'fluid ounces.'" *Id.* at *5 (emphasis in original). Ultimately, the Court

14 construed this allegation of material fact in the light most favorable to the plaintiff, noting that

15 "Plaintiff's allegations could just as easily refer to weight" rather than volume. *Id.*

16       Here, the Court will apply essentially the converse of the *Spacone* decision and construe

17 Plaintiff's "ounces" allegation as intending to represent the amount of "fluid ounces" of Biomite

18 applied to Plaintiff's crops.[7] If Plaintiff's "75.52 ounces" allegation refers to *fluid* ounces, then

19 when converted to gallons, this amounts to 0.59 gallons of Biomite mixed with 300 gallons of

20 water per acre.[8] Such a mixture would comply with the product label's instruction of using 0.59

---

[6] Alternatively, to avoid confusion, Defendant maintains that the Biomite label instructs mixing 32–64 ounces of Biomite per every 100 gallons of water. (Doc. 48 at 5.) As Plaintiff represents that it mixed 75.52 ounces of Biomite, Defendant suggests Plaintiff failed to comply with the label's instruction.

[7] Such a reading of the Complaint in terms of *volume* rather than weight is further supported by the product label's own instructions, which once more, are described in gallons—a unit of measurement to describe liquid volume, rather than the weight of the product. (Ex. A, Doc. 85 at 2.)

[8] "For reference, one gallon of water contains 128 fluid ounces." *United States v. Powers*, No. CR-23-08027-001-CT-MTL, 2023 WL 5926442, at *1 (D. Ariz. Sept. 12, 2023), *appeal filed*, No. 23-2218 (9th Cir. Sept. 13, 2023). The Court may *sua sponte* judicially notice such conversions of units of measurement. *See, e.g.*, *Lallande v. Penzone*, No. CV 22-00200-PHX-SMB (DMF), 2023 WL 3170362, at *3 n.4 (D. Ariz. Apr. 11, 2023) ("[S]ince 2 tablespoons contain 32 grams, 1 tablespoon contains 16 grams, . . ."); *Sacramento Downtown Arena LLC v. Factory Mut. Ins. Co.*, 637 F. Supp. 3d 865, 868 n.1 (E.D. Cal. 2022) (judicially noticing that "[a] statute mile, also known as a land mile, is 5,280 feet.") (citation omitted). Similarly, courts are competent entities to solve simple mathematical equations. *E.g.*, *Lallande*, 2023 WL 3170362 at *3 n.4. Thus, when dividing 75.52 fluid ounces by 128 ounces per

gallons of Biomite with 100–400 gallons of water per acre. (Ex. A, Doc. 85 at 2.) The Court will therefore read this material allegation in the light most favorable to Plaintiff and construe its allegation of "ounces" as indicating the amount of "fluid ounces" used in spraying its crops. *In re Facebook*, 956 F.3d at 601; *Spacone*, 2017 WL 6888497, at *5.

Even if Defendant were correct that Plaintiff's allegation refers to the *weight* of Biomite used, rather than its liquid volume, this would still not weigh in favor of granting Defendant's motion. According to Defendant, "the Biomite label instructs that the proper mixture of Biomite to water for grape crops is 1-2 quarts, or 32-64 *ounces* of Biomite . . . per every 100 gallons of water[.]" (Doc. 48 at 5 (emphasis added).) Even if this conversion is accurate, and Plaintiff applied 75.52 ounces of Biomite (rather than fluid ounces), this would only indicate Plaintiff's comparative fault, and it would be the obligation of the trier of fact to determine Plaintiff's equitable apportionment of loss when accounted for its own error. *Daly*, 20 Cal. 3d at 737, 742. Therefore, at this procedural juncture, outright dismissal of Plaintiff's strict products liability claim is simply inappropriate. *Id.* at 737; *Mariscal*, 52 F. Supp. 3d at 987.

Finally, the Court notes that Defendant does not bring separate or individualized arguments pertaining to Plaintiff's causation allegations regarding its negligent failure to warn claim. (Doc. 48 at 6–8.) Indeed, Defendant acknowledges that it moves to dismiss both claims under the same grounds as brought forth for Plaintiff's products liability claim. (*Id.* at 6 n.6.)[9] Therefore, for the same reasons as discussed above relating to Plaintiff's strict products liability causation theories, the Court declines to dismiss Plaintiff's negligent failure to warn claim. Defendant's Motion to Dismiss, (Docs. 47, 48), is therefore **DENIED** on these grounds.

        *ii.*   *Economic Loss Doctrine*

As a preliminary matter, in making this argument, Defendant relies on a plethora of out-of-circuit authority, representing that "[r]esearch identified no binding Ninth Circuit precedent or

---

gallon, the Court reaches the conclusion that 75.52 fluid ounces is the same as 0.59 gallons.

[9] This makes sense, given that the "substantial factor" causation standard applies in both the strict products liability *and* negligent failure to warn contexts, resulting in courts tending to analyze both claims together. *Himes*, 322 Cal. Rptr. 3d at 9, 11; *e.g.*, *Kinnee v. TEI Biosciences Inc.*, No. 22-cv-604-JLS (DDL), 2023 WL 8191097, at *11 (S.D. Cal. Nov. 27, 2023) (noting that causation standard is similar in both negligent failure to warn and strict products liability contexts).

authority from this Court directly on point," yet "several other federal courts have applied the economic loss doctrine[.]" (Doc. 48 at 8; *see also* Reply, Doc. 59 at 5 ("[T]his Court may nonetheless utilize its discretion and rely upon the persuasive authority cited by Nutrien to dismiss Plaintiff's claims as barred under the economic loss doctrine.").) Plaintiff notes that "none of the cases cited by Nutrien, . . . involve *California's* economic loss doctrine," and that under California law, a plaintiff may recover "when a product defect causes damage to 'other property,' that is, property other than the product itself." (Doc. 57 at 10 (emphasis in original).)

In *Rattagan v. Uber Technologies*, the Ninth Circuit addressed this issue, concluding: "Federal courts sitting in diversity, as here, apply state substantive law and federal procedural law. [Citation.] Application of the economic loss rule is substantive and thus governed by California law." 19 F.4th 1188, 1190 (9th Cir. 2021) (internal citations omitted) (breach of contract context); *see also Kalitta Air, L.L.C. v. Cent. Tex. Airborne Sys., Inc.*, 315 F. App'x 603, 605 (9th Cir. 2008) (applying California's economic loss doctrine in negligence and product liability context). Thus, Plaintiff is correct, and only California substantive law controls this inquiry.

"The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (Cal. 2004) (citation omitted). Thus, "[r]ecovery under the doctrine of strict liability is limited solely to physical harm to person or property. Damages available under strict products liability do not include economic loss, which includes damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits[.]" *Id.* at 989 (quoting *Jimenez v. Superior Ct.*, 29 Cal. 4th 473, 482–83 (Cal. 2002)). However, a plaintiff may recover "in strict products liability in tort when a product defect *causes* damage to 'other property,' that is, property *other than the product itself*." *Id.* (first emphasis added, second emphasis in original) (quoting *Jimenez*, 29 Cal. 4th at 482–83); *see also Sheen v. Wells Fargo Bank, N.A.*, 12 Cal. 5th 905, 922 (Cal. 2022) ("In general, there is no recovery in tort for negligently inflicted 'purely economic loss,' meaning financial harm unaccompanied by physical or property damage.") (collecting cases

11

1 and authorities).

2      In the FAC, Plaintiff does not sue for damages for the costs of repair and replacement of
3 Biomite, nor its inadequate value. *Robinson Helicopter*, 34 Cal. 4th at 988.  Though Plaintiff
4 ostensibly requests damages for "Lost profits," (Doc. 29 at 5, ¶ 3), this does not conclusively
5 determine that the economic loss doctrine bars its claims—Plaintiff clearly seeks to recover in tort
6 for the damage Biomite caused to its grape crops, *i.e.*, property *other than* the miticide itself.
7 *Robinson Helicopter*, 34 Cal. 4th at 989; *cf.* Doc. 29 at 4, ¶ 18 ("Anthony Vineyards was harmed
8 by the loss of 40 acres of Timpson grapes. . . and 60 acres of Scarlet Royal grapes[.]").  Thus,
9 because Plaintiff seeks recovery for property other than the defective product (*i.e.*, Biomite), and
10 seeks recovery for its damaged grape crops, the economic loss rule cannot bar Plaintiff's
11 recovery. *See Jimenez*, 29 Cal. 4th at 484 ("[T]he economic loss rule does not bar a homeowner's
12 recovery in tort for damage that a defective window causes to other parts of the home in which it
13 has been installed."); *see also Nucal Foods, Inc. v. Quality Egg LLC*, 918 F. Supp. 2d 1023, 1029
14 (E.D. Cal. 2013) (holding economic loss rule did not bar plaintiff's negligence claims in case
15 where defendants recalled eggs contaminated with salmonella because "plaintiff plausibly
16 suffered damages to other property, such as '[t]he destruction of eggs from other sources, as well
17 as the destruction of packaging materials,'" and thus "[s]uch damages beyond the contemplation
18 of the parties in their contractual bargain fall outside the scope of the economic loss rule.")
19 (citations omitted); *Baker v. Nutrien Ag Sols., Inc.*, No. 1:21-cv-01490-DAD-SKO, 2022 WL
20 3142065, at *1–*2, *11 (E.D. Cal. Aug. 5, 2022) (in case where crop advisor sold wrong
21 chemical to grower of 98 acres of alfalfa crop, economic loss doctrine did not preclude plaintiff's
22 negligence claim because she sufficiently alleged damage to "other property"—the alfalfa crop
23 itself—rather than the chemical product at issue).

24      Defendant principally relies on two cases stemming from the Sixth and Eighth Circuits to
25 maintain that Plaintiff did not suffer damage to "other property," but instead, suffered an
26 economic loss via its disappointed commercial expectations. (Doc. 48 at 8–9 (relying on
27 *Maynard Co-Op. Co. v. Zeneca, Inc.*, 143 F.3d 1099 (8th Cir. 1998) and *Bailey Farms, Inc. v.*
28 *NOR-AM Chem. Co.*, 27 F.3d 188 (6th Cir. 1994).)  Once more, neither case applies California

law[10], so they provide little assistance here. *Rattagan*, 19 F.4th at 1190; *Kalitta Air*, 315 F. App'x at 605. Even still, the Sixth and Eighth Circuits barred plaintiff's claims where the product *caused* harm to the "other property," or the crops in each case. *See Maynard*, 143 F.3d at 1100–02 (in case where Iowa dairy farmers suffered alfalfa crop loss after applying "Gramoxone and 2,4–D" herbicide, under the guidance of crop consultant, the Eighth Circuit affirmed application of economic loss doctrine because "[t]he failure of the 2,4–D to perform in that respect was the *cause* of the McSweeney's damages" and the plaintiff only sought pure economic loss in the form of compensatory damages) (emphasis added); *Bailey Farms*, 27 F.3d at 191 ("Although the watermelon crops at issue in this case also are technically 'other property' than the purchased product, a successful crop was part of the commercial expectations for the fumigant, and the loss of that crop allegedly *the result of* a defect of the use of the purchased product.") (emphasis added).

The California Supreme Court, however, has explicitly rejected this view of the economic loss doctrine, whereby the defective product and the damaged property are essentially one and the same because the product *caused* the property damage. *Jimenez*, 29 Cal. 4th at 483 ("California decisional law has long recognized that the economic loss rule does not necessarily bar recovery in tort for damage that a defective product (e.g., a window) *causes* to other portions of a larger product (e.g., a house) into which the former has been incorporated.") (emphasis added); *id.* ("[T]he duty of a product manufacturer to prevent property damage does not necessarily end when the product is incorporated into a larger product."). For this reason, the Supreme Court has counseled that the first step is to "determine what the product at issue is. Only then do we find out whether the injury is to the product itself (for which recovery is barred by the economic loss rule) or to property *other than* the defective product (for which plaintiffs may recover in tort)." *Id.* (emphasis added).

Applying *Jimenez*—to which the Court is bound to apply, *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 541 (9th Cir. 2021) (in addressing a question under California law, "we are bound by decisions of the state's highest court, . . ., and in deciding any unresolved

---

[10] *Maynard* applied Iowa law, 143 F.3d at 1102–03, while *Bailey Farms* applied Michigan law. 27 F.3d at 191.

or unclear questions of state law, we are guided by the principles that the state high court has articulated[.]") (internal quotation marks and citation omitted)—the causation theories promulgated by the Iowa and Michigan Supreme Courts, as interpreted by the Sixth and Eighth Circuits, do not apply in this instance. *Robinson*, 34 Cal. 4th at 989 (a plaintiff may recover "in strict products liability in tort when a product defect causes damage to 'other property,' that is, property *other than the product itself*.") (emphasis in original). Evidently, the use of Biomite on Plaintiff's grape crops incorporated the product into a larger product, resulting in damage to "other property" than the defective product at issue. The fact that Biomite caused this property damage does not bar Plaintiff's recovery under the economic loss rule. Thus, the economic loss rule is inapplicable, and the Court **DENIES** Defendant's motion on this ground.

        *iii.*    *Cal. Food & Agric. Code § 12855*

Defendant's third argument for dismissal invokes California Food & Agricultural Code § 12855, (Doc. 48 at 10–11), which states that a:

> [R]egistrant is not liable for any injury or damage that is suffered solely by reason of any of the following:
>
> (a) The use of the pesticide for a purpose that is not indicated by the label.
> (b) The use of the pesticide contrary to the printed directions of the registrant or seller.
> (c) The breach of any warranty by the registrant that is not expressly printed on the label.

Cal. Food & Agric. Code §§ 12855(a)–(c).

As a preliminary matter, the Court is not persuaded that Section 12855 applies in the first instance. As noted above, Section 12855 applies only to a "registrant," which is defined as "a person that has registered a pesticide and has obtained a certificate of registration from the department." Cal. Food & Agric. Code § 12755. "Every manufacturer of, importer of, or dealer in any pesticide, . . . shall obtain a certificate of registration from the department before the pesticide is offered for sale." *Id.* § 12811. In footnote eight of its motion, Nutrien mentions such requirements, and then summarily concludes that it "is hence a registrant under this definition." (Doc. 48 at 10 n.8.)

However, expressly excluded from the definition of a "registrant" is any "dealer or agent

14

that sells any pesticide that has been registered by the manufacturer or wholesaler[.]" Cal. Food & Agric. Code § 12811.  Thus, the Court agrees with Judge Drozd's comments in *Baker* that Defendant has "not clearly explained how Nutrien would qualify as a registrant under this statutory scheme, given that Nutrien appears to be a dealer or agent selling [Biomite] and thus would appear to fall into this latter category of non-registrants." *Baker v. Nutrien Ag Sols., Inc.*, No. 1:21-cv-01490-DAD-SKO, 2022 WL 3142065, at *12 (E.D. Cal. Aug. 5, 2022).  In other words, the Court is bound by the allegations set forth in Plaintiff's FAC and cannot accept facts set forth in Defendant's motion, *i.e.*, Defendant's implication that it obtained a certificate of registration.[11]  *In re Facebook*, 956 F.3d at 601; *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).  To the contrary, the FAC describes Nutrien as a distributor of Biomite.  (Doc. 29 at ¶¶ 7, 16.)  It is simply unknown whether Nutrien[12], or the manufacturer of Biomite, Natural Plant Protection[13] registered Biomite with the Department of Pesticide Regulation.[14]

Even if Section 12855 applied, however, Defendant's arguments still lack merit. In relying on this section, Defendant repeats its argument that Plaintiff misused the product. The Court has already rejected this claim.

Defendant asserts also that "to the extent Plaintiff alleges that its claims are supported by a purported breach of some unasserted duty of warranty purportedly owed to it by Nutrien, the fact that the 'Warranty Statement' of the label explicitly provided the circumstances such as 'water conditions' and 'weather,' among other things, were beyond the control of the seller of the

---

[11] Indeed, it appears that Section 12855 may constitute an affirmative defense, meaning that the Court may only consider such a defense if the face of the complaint establishes the defense.  *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 466 (9th Cir. 2023); *see also Baker*, 2022 WL 3142065, at *13 (analyzing § 12855 as an affirmative defense); *but see John Norton Farms, Inc. v. Todagco*, 124 Cal. App. 3d 149, 172 (Cal. Ct. App. 1981) ("[A] user of an economic poison such as Tenoran has the burden of either establishing use of the product in accordance with the instructions or directions contained in the product label or the nonapplicability of Food and Agricultural Code section[] . . . 12855 to prevail in a case such as the instant case").  Regardless, Defendant has simply proffered no authority that the Court may exceed the bounds of the Complaint, documents attached to the FAC, or facts of which the Court may take judicial notice. *Beverly Oaks Physicians Surgical Ctr., LLC v. Blue Cross & Blue Shield of Ill.*, 983 F.3d 435, 439 (9th Cir. 2020).  Thus, the Court may not reach into the motion to dismiss and accept Defendant's version of facts (or inferences) as true. *Id.*
[12] Cal. Food & Agric. Code § 12811
[13] Doc. 29 at ¶ 2; Cal. Food & Agric. Code § 12811
[14] Cal. Food & Agric. Code § 12752.2 ("Department means the Department of Pesticide Regulation when used in . . . Chapter 2 (commencing with Section 12751)"); see also id. § 12755 (a "registrant" is a person who registered a pesticide, and has obtained a certificate of registration from the "department.")

15

product," which bars Plaintiff's claims pursuant to Section 12855(c).  (*Id.*)  However, the FAC does not allege a breach of warranty, though it does allege that the warning label was insufficient.  (Doc. 29 ¶¶ 16-17, 21-22, 26-29).  Thus, Defendant's motion is **DENIED** on this ground.

> iv.     *Sophisticated Intermediary Doctrine*

Defendant moves to dismiss Plaintiff's negligent failure to warn claim because, it asserts, "Nutrien reasonably relied upon the Biomite's product label's warnings and instructions that were indisputably provided to downstream users." (Doc. 48 at 11.)  In other words, Defendant maintains that it acted reasonably in failing to warn Plaintiff of Biomite's ineffectiveness when used close in time to a rain event because Nutrien relied on others to warn the plaintiff downstream.  (*Id.*)

In *Webb*, the California Supreme Court succinctly synthesized the applicable "sophisticated intermediary doctrine" that Defendant appears to rely on here.  *Webb v. Special Elec. Co.*, 63 Cal. 4th 167, 176 (Cal. 2016).  "Although all sellers in a product's distribution chain have a duty to warn about known hazards, they may in some cases discharge that duty by relying on others to warn downstream users." *Id.* (citing Restatement of Torts (Third), Products Liability, § 2, cmt. 1).  Under the sophisticated intermediary doctrine:

> [A] supplier may discharge its duty to warn end users about known or knowable risks in the use of its product if it: (1) provides adequate warnings to the product's immediate purchaser, or sells to a sophisticated purchaser that it knows is aware or should be aware of the specific danger, *and* (2) reasonably relies on the purchaser to convey appropriate warnings to downstream users who will encounter the product.

*Id.* at 187 (emphasis in original). Ultimately, the "standard is one of reasonableness in the circumstances," and the relevant factors to consider include "the gravity of the risks posed by the product, the likelihood that the intermediary will convey the information to the ultimate user, and the feasibility and effectiveness of giving a warning directly to the user." *Id.* at 186–67 (citation omitted).  "[T]he sophisticated intermediary doctrine is an affirmative defense," *id.* at 187, and "ordinarily, affirmative defenses may not be raised on a motion to dismiss" unless "there is some obvious bar to securing relief on the face of the complaint." *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 466 (9th Cir. 2023) (quotation marks and citation

omitted). "In other words, dismissal based on an affirmative defense is permitted when *the complaint* establishes the defense." *Id.* (emphasis in original); *see also Boquist v. Courtney*, 32 F.4th 764, 774 (9th Cir. 2022) ("An affirmative defense is grounds for dismissal at the pleading stage only if the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense[.]") (quotation marks and citation omitted). As such, Nutrien bears the burden of showing that on the face of the FAC, "it adequately warned the intermediary, or knew the intermediary was aware or should have been aware of the specific hazard, and reasonably relied on the intermediary to transmit warnings." *Webb*, 63 Cal. 4th at 187.

Defendant urges that Biomite's product label contained warnings and instructions conveyed to Plaintiff "by its manufacturer," and once more, renews its argument that there is no "direct relationship between Nutrien and the Plaintiff." (Doc. 48 at 11.) Thus, in Defendant's view, Nutrien's delivery of a direct warning to Plaintiff "was infeasible." (*Id.*) Defendant's arguments ultimately miss the mark. According to the FAC, Nutrien "sold Biomite to defendant Jenco Enterprises, Inc., which sold Biomite to Plaintiff Anthony Vineyards." (Doc. 29 at ¶ 7.) Thus, there is no indication in the Complaint that Nutrien warned its "immediate purchaser," Jenco Enterprises of Biomite's alleged defects, or that Jenco was aware or should have been aware of Biomite's defects. *Webb*, 63 Cal. 4th at 187. So, there can be no reasonable inference or conclusion that Nutrien could have reasonably relied on Jenco to convey such warnings downstream to Plaintiff. *Id.* Indeed, such allegations are entirely absent in the FAC. As such, when confined to the face of the FAC, there is no basis to conclude that Plaintiff has pleaded itself out of such claims based on the defense of the sophisticated intermediary doctrine. Defendant's motion is **DENIED** on this ground.

## CONCLUSION

Based upon the foregoing, the Court **ORDERS**:

(1) Plaintiff's Request for Judicial Notice (Doc. 58) is **DENIED**.[15]

///

---

[15] Defendant's arguments, made in several places of its motion, that Plaintiff purportedly used the "false pretense of recent 'discovery'" to "untimely" add Nutrien as a party to this case are irrelevant to the issues raised under Rule 12. Consequently, the Court disregards them.

1    (2) Defendant's Motion to Dismiss (Docs. 47, 48) is **DENIED**.

IT IS SO ORDERED.

Dated:   **July 27, 2024**

UNITED STATES DISTRICT JUDGE