1

2

3

4

5

6

7

8               **UNITED STATES DISTRICT COURT**

9               **EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11   ANTHONY VINEYARDS, | Case No. 1:20-cv-00506-JLT-CDB |
| 12                    Plaintiff, | ORDER DENYING DEFENDANTS' MOTIONS TO EXCLUDE EXPERT |
| 13            v. | TESTIMONY |
| 14   UPL NA INC., ARYSTA LIFESCIENCE NORTH AMERICA, LLC, BRANDT | (Docs. 39, 40) |
| 15   CONSOLIDATED INC., NUTRIEN AG SOLUTIONS, INC., | |
| 16 | |
| 17                    Defendants. | |

18        Anthony Vineyards is a grower of organic grapes in Kern County.  (FAC, Doc. 29 at ¶ 1.)

19   Plaintiff brings this action against Defendants alleging theories of strict products liability and

20   negligent failure-to-warn after a May 2019 rain event destroyed its grape crops, following its use

21   of the miticide, Biomite.  (*Id.* at ¶¶ 12–14.)  Specifically, Plaintiff alleges that the Biomite label

22   fails to warn users that scarring can occur to grape crops if used close in time to rain events.  (*Id.*

23   at ¶ 14.)[1]

24        Arysta Lifescience North America, LLC, and UPL NA Inc. have filed a Motion to

25   Exclude Testimony of Gary Osteen and John Kovacevich (Docs. 39, 40). For the reasons stated

26   below, the Court **DENIES** both motions.  (Docs. 39, 40.)

27

28   _____

[1] For a greater recitation of the facts underlying this case, *see* Doc. 88 at 1–3.  *See also Anthony Vineyards v. UPL NA Inc.*, 2024 WL 3569498, at *1–*2 (E.D. Cal. July 29, 2024).

1

**I.      BACKGROUND**

2          Anthony Vineyards grows organic grapes in Kern County, California.  (FAC, Doc. 29 at

3    ¶ 1.)  On May 18, 2019, Plaintiff treated 40 acres of Timpson grapes and 60 acres of Scarlet

4    Royal grapes with a "minimum risk biochemical miticide that controls mites," called "Biomite."

5    (*Id.* at ¶¶ 2, 12.)  Following the advice of its pest control advisor, Plaintiff applied 75.52 fluid

6    ounces of Biomite with 300 gallons of water per acre.  (*Id.* at ¶ 12.)  Overnight, and into the

7    morning of May 19, 2019, "approximately 0.55 inch[es] of rain fell in the area of the treated

8    sites," resulting in severe scarring, and ultimately the loss of, all of Plaintiff's grape crops.  (*Id.* at

9    ¶¶ 13, 18, 23.)  Plaintiff alleges that "[t]he Biomite label fails to inform users that if Biomite is

10   applied at a less than the maximum advised water rates in proximity to a rain event, scarring can

11   occur if the Biomite migrates to the lower fruit surface, concentrating the Biomite and injuring

12   the fruit."  (*Id.* at ¶¶ 14, 16–17, 19–20.)  Plaintiff initiated this action against Defendants, alleging

13   two causes of action for strict products liability, premised on a theory of failure-to-warn, and

14   negligence.  (*See generally* FAC, Doc. 29.)

15          On August 20, 2021, Plaintiff filed its Designation of Expert Witnesses, listing

16   agronomist Gary Osteen as a retained causation expert under Rule 26(a)(2)(B).  (*See* Doc. 24 at

17   1–2.)  Plaintiff also designated John Kovacevich as a non-retained, additional causation expert

18   pursuant to Rule 26(a)(2)(C).  (*Id.* at 2.)

19          A.      Gary Osteen

20                  i.      *November 2019 Letter*

21          In the "late spring season" of 2018, Mr. Kovacevich conducted "a trial application of

22   Biomite [at] 75.52 [ounces] and 300 gallons of water per acre" applied to "one acre of table

23   grapes." This test resulted in "no fruit injury in the trial site." (Doc. 39-3 at 4.)  Thereafter, on

24   May 18th and following the written recommendation of grower/PCA Mr. John Kovacevich,

25   Scarlet Roya! (BLK 13, 15 and 17) and Timpson (BLK 21 and 22) were treated with Biomite at

26   75.52 oz in 300 gallons of water per acre covering approximately 100 acres total. During the

27   night of May 18th and into the early morning of the 19th approximately 0.55" of rain fell in the

28   area of the treated sites as measured at the Arvin-Edison CIMIS station #125." *Id*. In the week

1    following, the fruit was found to be damaged.

2         Kovacevich conducted a second trial "application utilizing the same Biomite rate and

3    water volume to a Timpson variety site," and then attempted to "duplicate a rain event" by "over-

4    spray[ing]" the crops with water approximately three hours thereafter.  (Doc. 39-3 at 4.)  "Fruit

5    injury symptoms did not result from the trial application."  (*Id.*)

6         On May 22, 2019, approximately three days after the scarring occurred, Osteen conducted

7    an investigation into the causes of the scarring.  (Doc. 39-3 at 4.) Osteen noted that Anthony

8    Vineyards had applied "multiple nutrient and fungicidal products during March, April and May of

9    2019," including, "calcium, phosphates, potassium, copper, sulfur, [and] surfactants[,] including

10   Miller Nu Film P, Entrust SC, Serenade ASO and Pro Gibb LV."  (*Id.*) Both the Scarlet Royal

11   grapes and the Timpson grapes were both treated with multiple pesticides, and "applied at normal

12   rates for table grapes in the Kern County area," on April 30th, and May 3rd.  (*Id.*)

13        Osteen then concluded that "the cause of the damage is related to the high water volume

14   used during the Biomite application and the following rain event.  Standard industry practice is

15   the use of reduced water volumes following berry formation in table grapes."  (*Id.* at 5.)  In other

16   words, Osteen first opined that because Kovacevich applied Biomite to 300 gallons of water per

17   acre, this "high water volume" is "known to cause berry ringing damage with some pesticides

18   from berry formation to harvest."  (*Id.*)  Though Osteen acknowledged that "[t]he Biomite label

19   allows the use of 100 to 400 gallons of water per acre in grapes[,] . . . in table grapes, the more

20   normal practice would be the use of the lower volume range after berry formation."  (*Id.*)  Osteen

21   noted that "Biomite is not a commonly used pesticide in the Kern County area," and that "[n]o

22   other Biomite applications to grapes have been reported in Kern County during the 2019 season at

23   the current time."  (*Id.*)

24        Osteen opined also that "[f]ruit surface residues from previous applications may have

25   played a roll [sic] in causing the scarring symptoms, but the previous application was

26   approximately two weeks prior to the Biomite application, when the berry size was very small."

27   (*Id.*)  Osteen continued that a rain event that occurred two weeks after the last pesticide

28   application "would further dilute the remaining residue on the subject foliage/berries, but may

1    have also transferred it onto sensitive berry tissue." (*Id.*) Osteen summed up his conclusions by

2    stating:

3
     > The results of the 2018 grower trial and the post injury trial of 2019 indicate the
4    > 300 gallon water rate alone was not the cause of fruit injury to Timpson and
     > Scarlet Royal table grapes at Anthony Vineyards.  The combination of 300
5    > gallons water at application and rainfall shortly thereafter may have caused
     > movement of the pesticide to the lower fruit surface concentrating the materials
6    > and leading to scarring symptoms (ref Exhibit 1).  Additional research should
     > evaluate applications of Biomite to table grapes in cool[,] wet weather patterns
7    > and at lower water application volumes.

8    (*Id.*)

9        Osteen detailed his investigation in a November 12, 2019 letter, which outlined what he

10   believed caused the scarring of Plaintiff's grapes.  (Doc. 39-3 at 4.)  On August 19, 2021, Osteen

11   provided his Rule 26(a) expert report in this matter.  (Doc. 24 at 5; Doc. 87 at 4.)  Osteen's report

12   provides four central opinions and conclusions.  (Ex. 1, Doc. 87 at 4–5.) Three days later, on

13   August 23, 2021, Plaintiff provided Osteen's November 12, 2019 letter to the defendants. (Doc.

14   39-3 at 2.)

15              *ii.     Deposition Testimony*

16       The defense deposed Osteen on September 18, 2021.  (Osteen Dep. Excerpt, Doc. 39-5 at

17   2.)[2] Osteen testified that he visited Plaintiff's fields "three times before November 12, 2019," but

18   never visited them thereafter, and that his November 2019 letter "[e]ncapsulated a summary of

19   [his] work up to that date." (*Id.* at 12:6–8, 28:22–29:1.) He explained that by the time he wrote

20   his November 2019 letter, he was "not prepared to say" that Biomite caused the grape crops'

21   damage.  (*Id.* at 27:10–28:5.)  Osteen did not conduct any further research after his visits between

22   May and November 2019, and his November 2019 letter.  (*Id.* at 29:2–10, 42:20–43:5.)

23       Even still, Osteen testified that Biomite caused the damage to Plaintiff's grape crops:

24
     > So it was clear to me that the damaging effects were caused by that Biomite spray.
25   > It is difficult to say why, other than the application followed shortly thereafter by
     > a significant rain fall of over half an inch of water.  It appears that the Biomite
26   > was washed down the surface of the fruit, ringing the fruit and causing russeting

27
     ---
28   [2] Defendants have separately e-mailed the Court with the complete depositions of each expert, pursuant to E.D. Cal. Local Rule 133(j).  When citing to the experts' deposition transcripts, *infra*, the Court will not cite to the CM/ECF page numbers, but rather, the page and line numbers of each deposition transcript.

1    and surface damage on the fruit.

2  (*Id.* at 60:6–13.)

3    Throughout his deposition, opposing counsel repeatedly asked Osteen about the

4  possibility of alternative causes, *i.e.*, that previously applied substances other than Biomite may

5  have caused damage to Plaintiff's grapes.  Osteen testified, when "looking at the products that

6  were applied before, the length of time with the rain event and the spray rigs that they use were

7  constantly spraying, there was just no real reason to test those products.  They weren't going to

8  show up, or they weren't going to show up as a cause." (Osteen Dep., Doc. 39-5 at 51:24–52:4.)

9  As a basis for these opinions, Osteen relied on his "41 years of working with those products on

10  table grapes," (*id.* at 23:24–25), and the fact that Anthony Vineyards had applied sulfur, Nu Film,

11  Gibb, and the Serenade to its grape crops in several "different sites, but the only sites that showed

12  damage were those with Biomite applied to it."  (*Id.* at 52:7–12.)  "So it was clear that it was

13  something with that application, and the only thing in that tank at that time was just Biomite."

14  (*Id.* at 52:12–14; see also *id.* at 61:9–15 (testifying that Yellow Jacket sulfur and Nu Film could

15  not have caused the damage to Plaintiff's crops because "[t]hat's a combination that we have

16  done for years and years and years in this valley over thousands of acres.  I've done it myself.

17  We've never had a problem.  Never had an issue especially at those rates.").)

18    Osteen admitted that Anthony Vineyards did not ask him to conduct any tissue testing of

19  their grapes and that he never conducted any tests on the grapes for several reasons. (Osteen Dep.,

20  Doc. 39-5 at 51:21–22.) Osteen explained that this testing was immaterial. When asked whether

21  "in order to rule out residues from the tank mix of Entrust, ProGibb, Serenade, sulfure and Nu

22  Film, one would have to test the grapes to see if those residues were present?" Osteen responded,

23  "Yeah.  You would have to test to see if those residues were present, but none of those products

24  would cause this sort of injury, so it didn't make a lot of sense of me to do testing on those grapes

25  at that point."  (*Id*. at 23:11–19.)

26    Osteen admitted that he "would like to see" such testing, and that it would have been

27  worth testing the grapes to see what other products were on them in May 2019.  (Osteen Dep.,

28  Doc. 39-5. at 22:5–17; *see also id.* at 47:21–48:14 (stating "I feel like [testing] should be done.").)

1    Yet, Osteen remained doubtful that a tissue analysis would produce "any result at all," (*id.* at

2    22:21) and believed it "may give us another piece of information, but it may not . . . it can also

3    cloud the whole picture because if you don't find anything or if the products don't hang around

4    very long, it doesn't tell you anything." (*Id.* at 48:1–14; *see also id.* at 57:5–9 ("That's two weeks

5    or longer after an application of sulfur. I don't think you're going to find it."), 68:13–17 ("You

6    could have tested it. I don't know. I would have to talk with the laboratory to see if they could

7    actually perform tests that would identify those small amounts of the four active ingredients in

8    that.").)

9         Finally, Osteen explained why the 2018 trial and the rain simulated trial were immaterial

10   to his findings:

11                          . . . In such a convoluted case, you would have to go out and put on
                            the sprays that they did prior to, then you would have to have a
12                          rain event in between, then you would have to apply the Biomite,
                            and you would have to get a rain that night or heavy overhead
13                          irrigation. We talked about putting out sprinklers and trying to do
14                          that. **It just -- it's too complicated. You're just never going to
                            duplicate those conditions.**
15
             Q.             But what was attempted was a reapplication of Biomite that did not
16                          result in fruit injury symptoms. Correct?

17           A.             Yes. The simple Biomite application, it did not have -- the
18                          previous application didn't have the previous rain. It really didn't
                            even have the amount of water.
19
                            . . .
20
                            You would have to do all of those things and get the same wet
21                          conditions and same time of year, and that application of nitrogen
                            was a -- we call it chemigation (phonetic) through the irrigation
22                          line, so it wasn't on the foliage. It was put into the root system.

23

24   (*Id.* at 53:6–54:12 (emphasis added).)

25       Ultimately, Osteen repeated that the use of Biomite is "rare," (*id.* at 64:2–3), that he has

26   "not seen another Biomite application made since this situation," (*id.* at 77:18–19), and that he

27   was unfamiliar with the interaction between Biomite and sulfur products. (*Id.* at 72:22-24.)

28   ///

1          B.      John Kovacevich

2          John Kovacevich was designated as a Rule 26(a)(2)(C) nonretained expert. (Doc. 24 at 2;

3   Kovacevich Dep., Doc. 40-3 at 4:19–22.)  He "is a grower at Anthony Vineyards." *Id.*  Plaintiff

4   reported that his testimony would outline "the use of Biomite, test applications, applications

5   resulting in crop damages, the expectations of growers regarding miticide instructions," and the

6   research, testing, and application of Biomite.  (Doc. 24 at 2.)  Plaintiff also expected Kovacevich

7   to opine on the "absence of any awareness from the product labelling of any potential for fruit

8   scarring if a rain event occurred in proximity to an application below the maximum water rates

9   advised."  (*Id.*)  He was also expected to testify to the "causation of damage from Biomite

10  application resulting in fruit scarring."  (*Id.*)

11         The defense deposed Kovacevich on May 26, 2021 and on September 17, 2021.  (Ex. A,

12  Doc. 40-3 at 2; Ex. A, Doc. 44-1 at 1.)  At his first deposition, Kovacevich testified that he had

13  worked as a vineyard manager for approximately fifty years.  (May 2021 Kovacevich Dep., Doc.

14  44-1 at 110:6–8.)  Kovacevich attended the University of Southern California, and after

15  graduating in 1969, he worked on his father's farm as a vineyard manager and has been a

16  manager there ever since.  (*Id.* at 109:25–110:5.)  Kovacevich received education from pest

17  control advisors, such as Chris Cucuk, on how to write product use recommendations.  (*Id.* at

18  110:9–19.)  He had been writing product use recommendations for Anthony Vineyards since

19  2015 and had been writing them in general since 2010.  (*Id.* at 76:24–75:5.)  Kovacevich testified

20  to using Biomite on a "trial basis" in July 2018—he "bought the product and tried . . . two rows

21  with the product to see what it would do against mites."  (*Id.* at 22:9–13.)  He recalls about four

22  hours of rainfall commencing in the evening after applying Biomite to the grape crops on May 18,

23  2019.  (*Id.* at 25:2–5, 39:7–20.)  The following Monday morning, two days thereafter, he

24  personally observed damage to the grapes.  (*Id.* at 40:11–41:7.)

25         At his second deposition, Kovacevich acknowledged that his July 2018 trial did not result

26  in any symptoms to the fruit, and he surmised that there was "a good chance" that sulfur, Nu

27  Film, Serenade, and Entrust, etc. were present on the grapes when he applied Biomite in the trial

28  run.  (Sept. 2021 Kovacevich Dep., Ex. A, Doc. 40-3 at 55:2–17, 55:23–56:2.)  Regarding the

1    scarred grapes, Kovacevich did perform a "tissue sample or test on the grapes that [he] noted fruit

2    scarring on," to test for whether nonorganic chemicals were present.  (*Id.* at 16:22–17:11.)  He did

3    no other tests to his grapes and testified that he did not know whether there was a different test

4    that he could do to "determine what the staining consisted of on those grapes."  (*Id.* at 17:24–

5    18:4, 42:16–25.)  He had not conducted "any testing or analysis of the tissue of the grapes that are

6    issue in this case."  (*Id.* at 18:9–14.)  Kovacevich testified that he could not rule out the presence

7    of other substances that may have been present on the grapes, such as Entrust, Serenade, Nu Film,

8    or Yellow Jacket sulfur.  (*Id.* at 20:14–24.)  This was, in part, because Kovacevich noted that

9    before applying Biomite, there were "three separate rain events" that occurred, and he "assumed

10   very little of anything was left on those vines."  (*Id.*; *see also id.* at 56:23–57:10.)  He did not

11   know how long Nu Film or sulfur could last on the fruit to which it is applied.  (*Id.* at 21:4–7,

12   42:12–15.)

13       Kovacevich opined that the application of Biomite, followed by a rain event, caused the

14   damage to Plaintiff's grapes.  (*Id.* at 26:24–27:5; *see also* Ex. B, Doc. 44-1 at 19:19–24.)  He

15   relied on his personal observations to support his opinion, and he did not rely on his attempts to

16   recreate the rain event.  (Ex. A, Doc. 40-3 at 27:6–19.) He admitted that the simulated rain trial

17   did not result in damage to the grapes.  (*Id.* at 56:3–18.)  Kovacevich explained that this was

18   because the temperature, amount of water applied, and weather conditions were different during

19   his simulated rain trial.  (Ex. B, Doc. 44-1 at 15:3–13, 20:9–13.)  "If I had known Biomite was an

20   oil, and I apply sulfur every seven to ten days, I wouldn't buy Biomite, at least not for grapes."

21   (*Id.* at 41:21–23.) Kovacevich opined that Biomite's label was deficient: "First thing, if it's . . . an

22   oil, it should call itself an oil," and "[i]f there is an issue with an application close to sulfur

23   application, I think that should be warned."  (*Id.* at 44:7–17.)  He noted there was a Chilean

24   version of the label that mentions sulfur, but the U.S. version did not.  (*Id.* at 44:22–25; Ex. B,

25   Doc. 44-1 at 37:18–38:2.)  Finally, Kovacevich opined that the label should have warned about

26   "application in the chance of a rain event," and that had known this existed, he would not have

27   applied Biomite.  (Ex. A, Doc. 40-3 at 45:1–3; Ex. B, Doc. 44-1 at 52:9–22, 54:2–4.)

28   ///

1

## II.     LEGAL STANDARD

2

### A.     Rule 702

3
The admission or exclusion of expert testimony is a matter within the discretion of the

4
district court. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  As the proponent of

5
these two experts, it is Plaintiff's burden to prove their proffered testimony is admissible under

6
Rule 702. *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) ("It is the proponent of the expert

7
who has the burden of proving admissibility.") (citations omitted); *Lust v. Merrell Dow Pharms.,*

8
*Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). A witness who is qualified as an expert by knowledge,

9
skill, experience, training, or education may testify in the form of an opinion or otherwise if:

10

11
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

12
(b) the testimony is based on sufficient facts or data;

13
(c) the testimony is the product of reliable principles and methods; and

14

15
(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

16
Fed. R. Evid. 702. "To carry out its gatekeeping role, a district court must find that an expert's

17
testimony is reliable – an inquiry that focuses not on 'what the experts say,' or their

18
qualifications, 'but what basis they have for saying it.'" *United States v. Holguin*, 51 F.4th 841,

19
854 (9th Cir. 2022) (citations omitted).

20
"For some experts, the relevant reliability concerns may focus upon personal knowledge

21
or experience." *Id.* (internal quotation marks and citation omitted).  "In such cases, the inquiry

22
may cover whether the expert's experience supports the expert's conclusions . . . or whether the

23
expert's reasoning is adequately explained." *Id.* (internal citations omitted).  To evaluate

24
reliability, the Court "must assess the expert's reasoning or methodology, using as appropriate

25
criteria such as testability, publication in peer-reviewed literature, known or potential error rate,

26
and general acceptance." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022)

27
(internal quotation marks and citation omitted).  "These factors are nonexclusive," and the Court

28
has discretion to determine reliability on a case-by-case basis. *Id.*  What is most important is the

9

1    expert's explanation of "how and why" they reached their conclusion(s).  *Gen. Elec. Co. v.*

2    *Joiner*, 522 U.S. 136, 144 (1997).

3                                   **III.    DISCUSSION[3]**

4         A.            Gary Osteen

5         Defendants move to exclude Osteen as an expert for three reasons.  First, Defendants

6    invoke *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, in

7    attacking Osteen's methodology as unreliable and based on insufficient facts and data.  (Doc. 39-

8    1 at 14–16.)  Second, Defendants request the Court exclude his opinions because of his purported

9    failure to comply with Rule 26(a)'s expert report requirements.  (*Id.* at 16–19.)  Relatedly,

10   Defendants represent that Osteen failed to provide documents supporting his opinions with his

11   report until ten days after his deposition.  (*Id.* at 19–20.)  The Court addresses each argument

12   below.

13                      *i.        Daubert Admissibility*

14        Defendants primarily move to exclude Osteen on the basis that his proffered opinions are

15   "not based on sufficient facts or data, or any scientific methodology," since Osteen conceded that

16   he did not test his theories.  (Doc. 39-1 at 15.)  Defendants represent that Osteen "cannot rule out

17   alternative causes of the alleged damage to Plaintiff's grapes," and that his opinions are mere

18   "bald and unsupported assertions" that lack a basis "aside from his own 'experience.'"  (*Id.*)

19   Defendants assert that Osteen's opinion as an expert in this case "contradicts his opinion that he

20   could not determine the cause expressed in his 2019 report, on which is 2021 report is based."

21   (*Id.*)  Thus, Defendants believe Osteen's proffered opinions are speculative, unreliable, and

22   without foundation.  (*Id.* at 16.)  The Court disagrees with Defendants on all accounts.

23        "Rule 702 grants the district judge the discretionary authority. . . to determine reliability in

24   light of the particular facts and circumstances of the particular case."  *Kumho Tire Co. v.*

25   *Carmichael*, 526 U.S. 137, 158 (1999).  In evaluating reliability, an expert may "draw a

26   conclusion from a set of observations based on extensive and specialized experience," and may

27

28   [3] At the outset, the Court notes that Defendants do not dispute that Osteen and Kovacevich are qualified under Rule 702 to proffer their opinions.  Fed. R. Evid. 702(a).  Instead, it appears they only contest each expert's reliability and methodology under Rules 702(b) and (c).  The Court limits its analysis accordingly.

1    rely on, for instance, "visual examination and process of elimination" to formulate an opinion.

2    *See id.* at 156; *see also United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022) (expert may

3    rely on personal knowledge or experience to formulate opinion); *Clausen v. M/V NEW CARISSA*,

4    339 F.3d 1049, 1058 (9th Cir. 2003) (context of differential diagnosis of medical patient: "Dr.

5    Elston's reasons for reaching the conclusion, by process of elimination, that contact toxicity was

6    the *specific* cause of the oyster deaths were similarly reliable.") (emphasis in original);

7    *Mensonides Dairy, LLC v. Agri-King Nutrition, Inc.*, No. 1:16-cv-03067-SAB, 2017 WL

8    6896796, at *6 (E.D. Wash. Oct. 5, 2017) (retained "forensic agronomist with experience

9    working on a number of defective-performing product cases," who had worked for the plaintiff's

10   dairy for almost twenty years was deemed reliable "based on his experience and training . . . as

11   well as his review of the relevant records."); Fed. R. Evid. 703 ("An expert may base an opinion

12   on facts or data in the case that the expert has been made aware of or personally observed.").

13          Other relevant reliability considerations include, *inter alia*, "[w]hether the expert has

14   adequately accounted for obvious alternative explanations."  Fed. R. Evid. 702 advisory

15   committee notes to 2000 amendment, *e.g.*, *Clausen*, 339 F.3d at 1058 ("A district court is justified

16   in excluding evidence if an expert utterly fails to offer an explanation for why [a] proffered

17   alternative cause was ruled out.") (cleaned up) (internal quotation marks and citation omitted).

18   However, "an expert need not rule out every potential cause in order to satisfy *Daubert*, as long as

19   the expert's testimony addresses obvious alternative causes and provides a reasonable explanation

20   for dismissing specific alternate factors identified by the defendant."  *Stanley v. Novartis Pharm.*

21   *Corp.*, 11 F. Supp. 3d 987, 1001 (C.D. Cal. 2014) (cleaned up) (internal quotation marks and

22   citation omitted).

23          Osteen relied on his "41 years of working with [the previously-applied] products on table

24   grapes," to formulate his opinion that the application of Biomite just before a rain event caused

25   the damage to Plaintiff's grapes, and to rule out why alternative products—*i.e.*, Entrust, ProGibb,

26   Serenade, sulfur, Nu Film, etc.—could not have caused the damage.  (*See, e.g.*, Osteen Dep. at

27   23:11–25, 60:6–61:15, 67:11–25.)  Osteen testified that he has only "seen sulfur burn foliage"

28   during the summer season application but had never seen "sulfur burn the berries[.]" (*Id.* at 24:1–

5.) Osteen noted that after combining Yellow Jacket sulfur and Nu Film "for years and years and years in this valley over thousands of acres," he had never "had an issue especially at those rates." (*Id.* at 61:9–15.)

Osteen based his opinion, at least in part, also on his personal experience with these other products applied to Plaintiff's grapes, (*e.g.*, *id.* at 26:24), his three visits to Anthony Vineyards' fields, (*id.* at 28:13–29:1, 30:12–17), his research into the phytotype of Biomite, (*id.* at 31:18–32:18), and research into Nu Film, (*id.* at 57:19–58:6), and his interview with Mr. Kovacevich and with Chris Cucuk, (*id.* at 36:25–37:16, 62:23–63:4, 70:5–8). Osteen explained why he could not rely on the two trials of Biomite on Plaintiff's grapes performed by Mr. Kovacevich. (*Id.* at 38:22–40:6, 41:5–42:23, 53:15–54:20, 63:10–22, 69:2–17.) Osteen also used a process of elimination to configure that Biomite was the cause of the damage. (*Id.* at 52:7–14 ("[T]hey had been applying similar products to all their different sites, but the only sites that showed damage were those with Biomite applied to it.  So it was clear that it was something with that application, and the only thing in that tank at that time was just Biomite."), 62:23–63:4.)

Though Osteen admitted that tissue testing of the grapes would have been helpful, he also explained why he did not conduct such testing.  (Osteen Dep. at 51:21–52:4 ("[B]ut looking at the products that were applied before, the length of time with the rain event and the spray rigs that they use were constantly spraying, there was just no real reason to test those products.  They weren't going to show up, or they weren't going to show up as a cause."), 56:12–57:9, 68:13–20.) In any event, however, Osteen's failure to test goes to the *weight* of his proffered testimony—not its admissibility.  *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017,1024 (9th Cir. 2022) ("Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. . .shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.") (internal quotation marks and citation omitted).  The same is true regarding Osteen's purported change in testimony between his November 2019 letter and his proffered testimony in this matter.[4]

---

[4] Sometimes, "contradiction renders [an expert's] opinions unreliable."  *Snyder v. Bank of Am., N.A.*, No. 15-cv-04228-KAW, 2020 WL 6462400, at *6 (N.D. Cal. Nov. 3, 2020) ("Mr. Nishimura's 2018 opinion that the Subject Property was worth $399,000 in 2013 is contradicted by his November 2016 opinion that the Subject Property was

1    Ultimately, the Court is satisfied that Osteen's own "specialized knowledge and

2  experience can serve as the requisite 'facts or data' on which [he may] render an opinion." *Elosu*,

3  26 F.4th at 1024; Fed. R. Evid. 703.  Osteen has provided the "how and why" underlying his

4  conclusions and opinion in this case, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144 (1997), which

5  appears to be, at least in part, his knowledge and expertise with the products previously applied to

6  Plaintiff's grapes, and his methodology of process of elimination to arrive at his conclusion.  And

7  he has explained away obvious alternative causes to the damage to Plaintiff's grape crops.

8  Osteen evidently had an adequate foundation for his opinion, and the Court simply cannot say

9  that it sounded in conjecture or speculation.  The Court therefore opines that Osteen is a reliable

10  expert in this matter and will not exclude him on this basis.

11              *ii.      Expert Report and Newly Produced Evidence*

12    In the alternative, Defendants complain that Osteen's Rule 26(a) expert report is deficient

13  in several ways and urge exclusion on this basis.  (Doc. 39-1 at 17–18.)  However, the Court

14  notes two deficiencies with Defendants' alternative arguments.  First, Defendants attack Osteen's

15  Rule 26(a) expert report, but fail to bring their motion pursuant to Rule 37(c)(1).  *See* Fed. R. Civ.

16  P. 37(c)(1) ("If a party fails to provide information . . . as required by Rule 26(a) or (e), the party

17  is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or

18  at a trial[.]").  This omission thereby failed to properly put Plaintiff on notice that it must

19  demonstrate that the report's deficiencies were "substantially justified or [ ] harmless." *Id.*

20  Second, the Court is not aware of any attempts made by defense counsel to seek approval of the

21  assigned magistrate judge prior to the filing of this motion.  (*See* Doc. 12 at 4 ("Likewise, no

22  written discovery motions shall be filed without the prior approval of the assigned Magistrate

23  Judge.").)  Defendants have made no showing of having raised this discovery dispute with the

24  _____

25  worth $590,000 in 2016, despite testifying that the property was noticeable deteriorated in 2016."); *but see In re Juul Labs, Inc.*, No. 19-md-02913-WHO, 2022 WL 1814440, at *4 n.5 (N.D. Cal. June 2, 2022) (contradictory expert testimony goes to the weight of the opinion).

26    The Court is unconvinced that Osteen's November 2019 letter is truly contradictory.  For instance, Osteen's letter concludes that both "[t]he combination of 300 gallons [of] water at application and rainfall shortly thereafter"

27  caused the damage to the grapes and left open that "[a]dditional research should evaluate applications of Biomite to table grapes in cool wet weather patterns and at lower water application volumes." (Doc. 39-3 at 5.) Also, Osteen's

28  letter explained why alternative products and substances could not have contributed to the damage.  (*Id.*)  This is is not clearly contradictory and appears to conform to his opinions in this case.

1    assigned magistrate judge before filing this attack as to the quality of the expert discovery.  (*Id.*)

2    For both reasons, Defendants' alternative grounds are denied as procedurally deficient.

3         Nevertheless, though the Court agrees that Osteen's Rule 26(a) report is deficient in

4    several respects[5], the Court declines to impose the harsh remedy of excluding Osteen in the wake

5    of his deposition testimony.  *See Merchant v. Corizon Health, Inc.*, 993 F.3d 733, 740 (9th Cir.

6    2021) ("The automatic nature of [Rule 37(c)'s] application does not mean that a district court

7    *must* exclude evidence that runs afoul of Rule 26(a)") (emphasis in original); *United States ex rel.*

8    *O'Connell v. Chapman Univ.*, 245 F.R.D. 652, 655 (C.D. Cal. 2007) (calling exclusion of an

9    expert an "extremely harsh remedy").  Normally, "under Rule 26 of the Federal Rules of Civil

10   Procedure, subsequently given deposition testimony is not a substitution for adequate disclosure

11   in the expert's original report."  *Edwards Lifescis. Corp. v. Meril Life Scis. Pvt. Ltd.*, No 19-cv-

12   06593-HSG, 2022 WL 254348, at \*7 (N.D. Cal. Jan. 27, 2022) (internal quotation marks and

13   citation omitted).  The rationale underlying this principle is that "an incomplete expert report is

14   prejudicial to Defendant in that it undermines Defendant's ability to properly prepare for an

15   effective deposition."  *Pineda v. City and Cnty. of S.F.*, 280 F.R.D. 517, 521–22 (N.D. Cal. 2012);

16   *Eno v. Forest River Inc.*, No. 2:20-cv-706-DWC, 2021 WL 6428636, at \*3 (W.D. Wash. July 1,

17   2021) ("The expert report must be complete such that opposing counsel is not forced to depose an

18   expert in order to avoid ambush at trial; and moreover the report must be sufficiently complete so

19   as to shorten or decrease the need for expert depositions and thus to conserve resources."); *see*

20   *also Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008) ("The purpose of Rule

21   26(a)(2) is to provide notice to opposing counsel—before the deposition—as to what the expert

22   will testify").

23        However, Defendants' simply fails to show any prejudice in preparing for Osteen's

24   deposition.[6] Though not provided with his November 2019 letter with his report, the report relied

25

26   [5] For instance, all four of Osteen's opinions and conclusions sound in impermissible legal conclusions.  (Doc. 87 at
     4–5); *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) ("[A]n expert witness
27   cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law."); *e.g.*, *Haas v.
     Travelex Ins. Servs. Inc.*, 679 F. Supp. 3d 962, 967 (C.D. Cal. 2023) (excluding expert report where the "report reads
     like a legal brief and impermissibly opines on ultimate issues of law.").

28   [6] Once more, though it is true that normally under Rule 37(c), "[t]he party facing sanctions bears the burden of
     proving that its failure to disclose the required information was substantially justified or is harmless," *Unicolors, Inc.*

1    on it, as noted by the defense (Doc. 39-3 at 2) and Plaintiff produced the letter within three days

2    of producing the expert report. *Id*. Though this disclosure occurred three days after the parties'

3    expert disclosure deadline, once more, Defendants have failed to describe any prejudice they

4    faced by this slightly tardy disclosure, particularly when Osteen's deposition took place on

5    September 18, 2021, almost one month thereafter.  (*See* Doc. 12 at 3 ("The parties are directed to

6    disclose all expert witnesses [fn], in writing, on or before **August 20, 2021**," including their Rule

7    26(a)(2) reports) (boldface in original), footnote omitted.)

8         This is significant because Osteen's November 2019 letter served detailed the bases for

9    his opinions.  (*See* Doc. 39-3 at 4–5.) It provided the "how and why" supporting his causation

10   opinion that the use of 300 gallons of water followed shortly thereafter by rainfall "may have

11   caused movement of the pesticide to the lower fruit surface concentrating the materials and

12   leading to scarring symptoms[.]" (*Id.* at 5.)  Defendants have not explained how they faced

13   prejudice in the preparation of Osteen's deposition after reviewing his letter.  What is more, it is

14   apparent that any prejudice that may have existed was eliminated through the deposition process.

15        Lastly, Defendants complain that Osteen arrived at his deposition with newly produced

16   evidence:  two thumb drives containing a "substantial volume of photographs" and documents,

17   that "neither Plaintiff's counsel nor Defendants' counsel were able to access at the deposition."

18   (Doc. 39-1 at 20; *see also* Tobin Decl., Doc. 39-4 at ¶ 3 (attesting that defense counsel could not

19   open the documents until ten days after Osteen's deposition).)  The Court cannot ignore the

20   repeated efforts made by plaintiff's counsel to reschedule, postpone Osteen's deposition, continue

21   the completion of Osteen's deposition or otherwise accommodate defense counsel, in light of this

22   newly produced evidence. (*See* Osteen Dep. at 7:17–18 ("I'm happy to accommodate Counsel in

23   any way . . ."), 8:11–12 ("Well, maybe we better just postpone the deposition and – until you're

24   satisfied."), 9:24–10:2 ("I mean, I'm happy to work with you in any way I can.  As it relates to

25   produced materials, we'll continue to accommodate you in any way we can.").)  Taking

26   advantage of this willingness, defense counsel "reserve[d] [his] right to object and reconvene the

27

28   *v. H&M Hennes & Mauritz, L.P.*, 52 F.4th 1054, 1073 (9th Cir. 2022), imposing this burden on Plaintiff would simply be unfair given Defendants' failure to raise Rule 37(c) as the basis for this portion of its motion, in addition to other procedural defects that Defendants committed in the filing of this motion.

1    deposition if [he] determine[d] that what's been produced today [did] not comply with Rule 26,"

2    and plaintiff's counsel complied, stating "let me just tell you[,] we won't have an argument on

3    that.  If you see something in those photos or the like that you want to ask further questions on, I

4    think we can probably do that with some Zoom conference to spare you some travel, but I would

5    leave that open for that."  (*Id.* at 98:22–99:6.)

6         Defendants could have sought the Court's immediate assistance if Plaintiff refused to

7    allow further deposition of Osteen, if that turned out to be necessary. Defendants failed to do so

8    and has offered no explanation why, in the intervening three years, they have not sought to do so.

9    Moreover, Defendants have not demonstrated if or how the contents of the thumb drives were

10   surprising after having received Osteen's opinions expressed in writing and in oral testimony.

11   Defendants' Motion to Exclude the Testimony of Gary Osteen (Doc. 39) is **DENIED**.

12        C.    John Kovacevich

13        Defendants attack the reliability of Kovacevich's proffered testimony.  (Doc. 40-1 at 10–

14   12.)  As with Osteen, they argue that Kovacevich's opinions are not based on facts or scientific

15   methodology, do not rule out alternative causes, disregard the results of his own tests that

16   contradict his opinions in this case, and are based on "speculation and conjecture, lack

17   foundation, are unreliable, and were proven false by his own testing[.]" (*Id.* at 11–12.)

18        For his opinions, Kovacevich relied upon his personal observations and his fifty years of

19   experience working as a vineyard manager. (*See* May 2021 Kovacevich Dep., Doc. 44-1 at

20   40:11–41:7; Sept. 2021 Dep. Ex. A, Doc. 40-3 at 27:6–19.)  The fact that his expertise was

21   developed through personal experience does not render his testimony unreliable or inadmissible.

22   *See United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022); *Reed v. Lieurance*, 863 F.3d

23   1196, 1208 (9th Cir. 2017); *In re Toyota Motor Corp.*, 978 F. Supp. 2d 1053, 1065 (C.D. Cal.

24   2013) ("The Rule 702(b) 'facts or data' upon which the expert opinion must be based may come

25   from the expert's personal observation, or the expert may simply be 'made aware of' those facts

26   or data.") (citing Fed. R. Evid. 703). Though Kovacevich could not "rule out that" other

27   substances were "*present*" on the grapes, this fails to demonstrate that his opinions are unreliable.

28   (Ex. A, Doc. 40-3 at 20:14–24 (emphasis added).)

16

1    Defendants do not cite to any portions of his deposition testimony where he failed to

2    explain why the damage could *not* have been caused by, for example, sulfur, Serenade, Entrust, or

3    Nu Film.  That Kovacevich admits that these substances were "present" does not also imply that

4    he also admits they were contributing causes.  If anything, Kovacevich was able to explain why

5    he did not believe these other products caused the damage—because he assumed "very little of

6    anything was left on those vines."  (Ex. A, Doc. 40-3 at 20:14–24, 56:23–57:10.)

7    Kovacevich acknowledges flaws within his own attempts at recreating the events, which

8    caused the damage to the fruit.  Kovacevich explained that his tests were not reliable due to

9    variations in temperature, the amount of water applied, and weather conditions.   (Ex. B, Doc. 44-

10    1 at 15:3–13, 20:9–13.)  This does not render his own ultimate opinion in this case unreliable.

11    This goes to the weight of his testimony, not its admissibility.  Similarly, that he failed to conduct

12    testing of the grape tissue to determine the presence of previously applied chemicals also goes to

13    the weight of his testimony, not his reliability.  *Elosu v. Middlefork Ranch Inc.*, 26 F.4th

14    1017,1024 (9th Cir. 2022).

15    The Court cannot conclude that Kovacevich's opinions were based on "bald and

16    unsupported assertions," "speculation and conjecture," or unfounded bases, as Defendants

17    suggest.  (Doc. 40-1 at 11.) The record demonstrates that his opinions are based in his fifty years

18    of experience as a vineyard manager, his personal observation of the damage to the grapes, his

19    ability to explain why his simulated rain trial did not produce damage, and why the other products

20    previously applied to the grapes could not have produced the damage.  Accordingly, Defendants'

21    Motion to Exclude John Kovacevich (Doc. 40) is also **DENIED**.

## IV.    CONCLUSION AND ORDER

23    Based on the foregoing, it is **ORDERED** that Defendants' Motion to Exclude the

24    Testimony of Gary Osteen (Doc. 39) and Motion to Exclude John Kovacevich (Doc. 40) are both

25    **DENIED**.

26

27    IT IS SO ORDERED.

28    Dated:    **September 19, 2024**

UNITED STATES DISTRICT JUDGE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28